UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| WAYNE C. GOODRICH, | Case No. 3:18-cv-00562-MMD-CLB |
| Plaintiff, | ORDER |
| v. | |
| GARRISON PROPERTY AND CASUALTY INSURANCE COMPANY, INC., dba USAA, | |
| Defendant. | |

I.   **SUMMARY**

This is an insurance coverage and bad faith dispute. Plaintiff Wayne C. Goodrich asserts claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and violation of Nevada's Unfair Claims Practices Act ("UCPA") against his insurer, Defendant Garrison Property and Casualty Insurance Company. (ECF No. 1-1.) Before the Court is Defendant's motion for summary judgment. (ECF No. 61 ("Motion").) Defendant argues that there is no coverage for Plaintiff's loss under the homeowner's insurance policy ("Policy"), Plaintiff lacks sufficient evidence to demonstrate a breach of the implied covenant of good faith and fair dealing, and Plaintiff's UCPA claim fails as a matter of law. Plaintiff responds there is a genuine dispute of material fact as to whether the Policy covers his loss, whether Defendant's denial of his claim was done in bad faith, and whether Defendant is subject to liability under the UCPA. (ECF No. 62.) Because the Court finds there is no coverage for Plaintiff's loss under the Policy and Defendant had a reasonable basis to deny his claim, the Court will grant Defendant's Motion.

///

///

///

1   II.     **BACKGROUND**

2   The following facts are undisputed unless otherwise noted.

3                   1.     **Plaintiff's Loss**

4   Plaintiff owns a house in Incline Village ("the Residence") which he describes as a

5   "part-time home." (ECF No. 61-1 at 3.) His other part-time residence is in the California

6   Bay Area. (*Id.*) In May of 2017, a friend who was staying at the Residence informed him

7   that there appeared to be water damage to the ground floor. (*Id.*) The friend sent Plaintiff

8   a photo of the apparent water damage. (*Id.*) At that time, Plaintiff was at his California

9   home. (*Id.*) On May 20, 2017, Plaintiff texted his contractor, Peter Angela, and forwarded

10  the picture. (ECF No. 61-13 at 2.) Angela agreed to go to the Residence to inspect the

11  damage and take additional photos. (*Id.*) On or about May 22, 2017, Plaintiff reported the

12  claim to Defendant, his insurer.[1]

13  Plaintiff reported his claim on the phone to claims adjuster, Jacob Bristow. (ECF

14  No. 61-3 at 2.) Based on his discussion with Plaintiff, Bristow made the following notes in

15  the claim log: "ground wtr issue," "seepage," "adv there is no coverage for seepage of

16  wtr," "ni said he would like inspection" "set up for i/a," and "**Pending** i/a inspection." (*Id.*

17  at 3-4.) Bristow later testified that these notes indicated he had advised Plaintiff there was

18  likely not coverage because the type of damage he was describing would be excluded by

19  the Policy, and that Plaintiff then requested an inspection. (ECF No. 62-7 at 25.) Bristow

20  further testified that his call with Plaintiff would have taken approximately 10 minutes. (*Id.*

21  at 22.)

22  After determining Defendant did not have any field adjusters near the Residence,

23  Bristow requested that an independent adjuster be assigned to the claim to conduct the

24  investigation. (*Id.* at 25-26.) The independent adjuster assigned to the claim was Matt

25  Siebrandt, working for Crawford & Company ("Crawford"). (ECF No. 61-4 ("Crawford

26  Report").)

27  _____

28  [1]At his deposition, Plaintiff responded to the question "When did you first report the
damage to Garrison?" with "I believe that was May 23rd, 2017." (ECF No. 61-1 at 3.) The
claim log shows a creation of loss report on May 22, 2017. (ECF No. 61-3 at 2.)

2

### 2.    Defendant's Investigation and Denial

Siebrandt inspected the Residence on May 25, 2017, three days after Plaintiff requested the inspection. (*Id.* at 2.) Siebrandt noted "[t]he appointment was set per the insured's availability." (*Id.* at 2.) He met Angela at the Residence, and Angela accompanied him during the investigation. (*Id.*) Siebrandt submitted to Defendant a two-page written summary of his findings and twenty photographs of the damage. (*Id.* at 2-3, 7-16.) Siebrandt's written evaluation determined:

> The cause of the loss stems from what appears to be groundwater seeping up through the dwellings slab or stem wall causing water damages to the bottom level of the residence. Upon inspection we found evidence of water damage and mold around the flooring and lower walls of main level of the dwelling. It appears that due to the massive amount of snow in the Tahoe region this winter the recent melt has led to a high water table which has caused the water to seep up through the slab. We understand any and all leaks have been ruled out.

(*Id.* at 3.) The photos in Siebrandt's report depict discoloration at the entry (*id.* at 7-8), possible mold or other growth on the baseboards (*id.* at 8-9), warping in the wood floors (*id.* at 11-12), water stains on the garage floor and visible foundation (*id.* at 12-14), the slope of the property (*id.* at 14-16), and a remnant of a snow pile next to the base of the Residence (*id.* at 16). Siebrandt concluded the apparent cause of the loss was "[g]roundwater due to high water table has led to damages on the ground floor" and that the "[e]ntire loss appears to be excluded due to groundwater not being a covered peril." (*Id.* at 2.)

Bristow received Siebrandt's report later that same day, May 25, 2017. (ECF No. 61-3 at 4.) Bristow determined after reviewing the report that the claim would be denied because seepage is an excluded loss under the Policy. (ECF No. 61-3 at 4-5.) Bristow then conferred with his manager, Kirbie Porter, whose job involves working with seven to twelve adjusters to assist them in resolving property claims. (ECF No. 62-11 at 8-9.) Porter agreed there was no coverage for Plaintiff's loss because of "seepage." (ECF 61-3 at 5.) The next day, May 26, 2017, Bristow called Plaintiff and left a voice-message

1   advising him the claim would be denied (*id.* at 5), and issued a formal denial letter (ECF

2   No. 61-6 ("Denial Letter")).

3   In the Denial Letter, Defendant states that, "based on the inspection by the

4   Independent Adjuster, the damage was caused by water below the surface of the ground

5   which exerts pressure or seeps through a foundation or building." (*Id.* at 2.) The Denial

6   Letter provides the pertinent policy exclusion, "1. c. (4)." (*Id.*)

### 3.    Post-Denial Expert Opinions on the Water Damage

8   The parties retained several experts to determine the cause of the water damage

9   with more precision. First, Plaintiff retained Marvin E. Davis & Associates ("Davis"),

10   geotechnical and civil engineers, to inspect the premises and draft corrective drainage

11   designs. (ECF No. 61-8.) After visiting the Residence on June 16, 2017, Davis prepared

12   a project description which noted "[w]ater seepage through the walls, including flooding

13   and mold damage to interior drywall, has required gutting and decontamination of the

14   finishes throughout the ground floor." (*Id.* at 3.) They recommended several approaches

15   to "correct[] subsurface seepage and surface drainage." (*Id.*)

16   Plaintiff then retained Midkiff & Associates, Inc. ("Midkiff"), planning and permitting

17   consultants, to obtain approval from the Tahoe Regional Planning Agency so that Davis

18   could improve the drainage of the property. (ECF No. 61-11 ("Midkiff Report").) In its

19   September 19, 2017 report, Midkiff described the Residence as "impacted by offsite flows

20   generated from nearby Incline Golf Course. While impacts have been occurring for

21   several years, the most recent winter exasperated the situation significantly. The offsite

22   flows have impacted the house foundation . . . ." (*Id.* at 2.)

23   After Plaintiff made a claim against the Incline Village General Improvement

24   District, the District retained Lumos & Associates ("Lumos"), civil and structural engineers,

25   to investigate the cause of the water intrusion. (ECF No. 61-12 ("Lumos Report").) Lumos'

26   investigation, was completed in November 2017, concluded:

27       The 2016/2017 winter and spring were significantly above average in
         precipitation, snow pack, and spring runoff. There was no indication by the
28       property owner that surface runoff contributed to the flooding. The general
         slope of the surrounding topography and the property contributed to

directing groundwater flow toward the foundation of the house and ultimately water seeping into the first floor. Based on the above information, Lumos determined [redacted] flooded due to groundwater flow as a result of above average precipitation and snow melt.

(*Id.* at 18.) The Lumos Report contains substantial data about the level of the water tables during that season and the impact of the increased snowpack on the discharge in spring and summer. (*Id.* at 10-14.)

After Plaintiff filed his lawsuit, Defendant retained Ninyo & Moore ("Ninyo"), geotechnical consultants, to again investigate the Residence. (ECF No. 61-14 ("Ninyo Report").) Ninyo concluded in its July 1, 2019 report that "offsite drainage from the golf course located north of the residence and large accumulations of snow adjacent to the foundation of residence are the primary sources of water contributing to the moisture intrusion and saturation of subsurface soils." (*Id.* at 8.) Ninyo considered possible contributing factors to be "inadequate surface drainage conditions" and "inadequate subsurface drainage provisions." (*Id.*)

Finally, Plaintiff retained Nortech Geotechnical/Civil Consultants, Ltd. ("Nortech"). (ECF No. 61-15 ("Nortech Report").) Nortech conducted a review of the Crawford Report and questioned how Siebrandt's conclusion could be formed "without conducting a subsurface investigation." (*Id.* at 2.) Nortech continued, "there can be no confirmation of what caused the wet and free water conditions in the residence." (*Id.*) No evidence was submitted that Nortech ever conducted a physical investigation of the Residence.

### 4.    Procedural History

Plaintiff filed a lawsuit in the Eighth Judicial District Court of the State of Nevada on October 15, 2018. (ECF No. 1-1.) In his Complaint, Plaintiff asserts five claims against Defendant. The first is a claim for breach of contract, asserting that Defendant wrongly denied Plaintiff's loss because it was covered by the Policy. (*Id.* at 4.) The next two claims—contractual and tortious breach of the implied covenant of good faith and fair dealing tortious breach of the implied covenant of good faith and fair dealing—assert that Defendant denied Plaintiff's claim in bad faith. (*Id.* at 3-4.) Plaintiff's fourth claim alleges

that Defendant is liable for violations of NRS § 686A.310, the Nevada Unfair Insurance Trade Practices Act. (*Id.* at 4-5.) Finally, Plaintiff requests declaratory relief that the Policy provides coverage for his loss. (*Id.* at 5.)

Defendant removed to federal court on November 26, 2018. (ECF No. 1.) After conducting discovery, Defendant moved for summary judgment on all claims. (ECF No. 61.)

## III.    LEGAL STANDARD

"The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court." *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994) (citation omitted). Summary judgment is appropriate when the pleadings, the discovery and disclosure materials on file, and any affidavits "show there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable fact-finder could find for the nonmoving party and a dispute is "material" if it could affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). Where reasonable minds could differ on the material facts at issue, however, summary judgment is not appropriate. *See id.* at 250-51. "The amount of evidence necessary to raise a genuine issue of material fact is enough 'to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 902 (9th Cir. 1983) (quoting *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968)). In evaluating a summary judgment motion, a court views all facts and draws all inferences in the light most favorable to the nonmoving party. *See Kaiser Cement Corp. v. Fischbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986) (citation omitted).

The moving party bears the burden of showing that there are no genuine issues of material fact. *See Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 883 (9th Cir. 1982). Once the moving party satisfies Rule 56's requirements, the burden shifts to the party resisting

6

1    the motion to "set forth specific facts showing that there is a genuine issue for trial."

2    *Anderson*, 477 U.S. at 256. The nonmoving party "may not rely on denials in the pleadings

3    but must produce specific evidence, through affidavits or admissible discovery material,

4    to show that the dispute exists," *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir.

5    1991), and "must do more than simply show that there is some metaphysical doubt as to

6    the material facts." *Orr v. Bank of Am.*, 285 F.3d 764, 783 (9th Cir. 2002) (quoting

7    *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). "The mere

8    existence of a scintilla of evidence in support of the plaintiff's position will be insufficient[.]"

9    *Anderson*, 477 U.S. at 252.

10   **IV.    DISCUSSION**

11          The Court will address first whether Plaintiff's loss was excluded under the policy.

12   Then, the Court will turn to whether there is sufficient evidence for Plaintiff to sustain a

13   claim for bad faith. Finally, the Court will consider whether there is any evidence that

14   Defendant is liable for a violation of NRS § 686A.310. Because the Court finds that (1)

15   Plaintiff's loss was excluded by the Policy, (2) Plaintiff has failed to provide evidence that

16   would create a genuine dispute of whether Defendant acted in bad faith, and (3) Plaintiff

17   has failed to provide evidence to support liability under NRS § 686A.310, the Court will

18   grant Defendant's Motion. Consequently, Plaintiff's request for declaratory relief will be

19   denied.

20          **A.    Coverage and Breach of Contract**

21          The parties dispute whether Plaintiff's loss is covered by the terms of the Policy.

22   Defendant argues that regardless of the source of the water that caused damage to the

23   Residence, the water damage exclusion applies to Plaintiff's loss. (ECF No. 61 at 22.)

24   Plaintiff counters that the cause of the water damage—differentiating between a 'sudden

25   and accidental' loss and excluded 'groundwater seepage'—could impact whether the

26   Policy covers Plaintiff's loss. (ECF No. 62 at 25.) Because the Court finds that a loss can

27   be both 'sudden and accidental' and also excluded, the Court finds there is no genuine

28   dispute of material fact. Because there is no genuine dispute of fact, the Court will

interpret the meaning of the Policy as a matter of law. *See Fed. Ins. Co. v. Am. Hardware Mut. Ins. Co.*, 184 P.3d 390, 392 (Nev. 2008). Moreover, because the language of the Policy excludes coverage for Plaintiff's loss, the Court will grant Defendant's Motion on the breach of contract claim.

Under Nevada law, "[t]he language of an insurance policy is broadly interpreted in order to afford the greatest possible coverage to the insured." *United Nat'l Ins. Co. v. Frontier Ins. Co., Inc.*, 99 P.3d 1153, 1157 (Nev. 2004) (internal quotations omitted). "An insurance policy may restrict coverage only if the policy's language clearly and distinctly communicates to the insured the nature of the limitation." *Id.* (internal quotations omitted). "[A]ny ambiguity or uncertainty in an insurance policy must be construed against the insurer and in favor of the insured." *Vitale v. Jefferson Ins. Co.*, 5 P.3d 1054, 1057 (Nev. 2000). But "the language of an insurance policy will be given its plain and ordinary meaning from the viewpoint of one not trained in law." *United Nat'l Ins. Co.*, 99 P.3d at 1156-57 (internal quotations omitted). Accordingly, the court may not "rewrite contract provisions that are otherwise unambiguous or increase an obligation to the insured where such was intentionally and unambiguously limited by the parties." *Id.* at 1157 (internal quotations omitted). "The question of whether an insurance policy is ambiguous turns on whether it creates reasonable expectations of coverage as drafted." *Id.*

The Nevada Supreme Court has adopted the doctrine of efficient proximate cause for insurance cases. *See Fourth St. Place v. Travelers Indem. Co.*, 270 P.3d 1235, 1244 (Nev. 2011). "[W]here covered and noncovered perils contribute to a loss, the peril that set in motion the chain of events leading to the loss or the 'predominating cause' is deemed the efficient proximate cause or legal cause of loss." *Id.* at 1243. "Generally, this determination is left to the trier of fact, but when the facts are settled or undisputed, the determination is for the court as a matter of law." *Id.* at 1243-44. "The court then evaluates the coverage of an insurance policy based on the determined efficient proximate cause of the loss." *Id.* at 1244.

///

8

1

### 1.    Coverage for "Sudden and Accidental" Losses

2   The parties make much of the distinction between a "sudden and accidental loss"

3   and loss that falls within an enumerated exclusion in the Policy. But this distinction is

4   irrelevant to the outcome of the coverage dispute. A loss can be both "sudden and

5   accidental" and fall under an enumerated exclusion. The Policy begins: "We insure

6   against 'sudden and accidental' direct, physical loss to tangible property described in

7   PROPERTY WE COVER coverages A and B unless excluded in Section I – LOSSES WE

8   DO NOT COVER." (ECF No. 61-2 at 27.) The water damage exclusion appears in Section

9   I as one of several losses not covered by the Policy. (*Id.* at 30.) Plaintiff argues that

10   because his loss was "sudden and accidental," the Policy provides coverage. (ECF No.

11   62 at 27-29.) Although Defendant's briefs muddle the issue somewhat by attempting to

12   contrast "'sudden and accidental' events" from "water damage" (ECF Nos. 61 at 23, 63 at

13   11), their central argument that the water damage exclusion precludes coverage for

14   Plaintiff's loss ultimately is correct. Under the plain meaning of the Policy, a loss may be

15   sudden and accidental, yet excluded from coverage if it falls within an enumerated

16   exclusion. Plaintiff's claim that the language "sudden and accidental" provides coverage

17   is therefore unresponsive to the applicability of the groundwater exclusion.

18   When considered as a whole, the Policy anticipates that water damage may arise

19   without anticipation and still be excluded. The section containing the water damage

20   exclusion also addresses exclusions for other unanticipated catastrophic losses,

21   including earthquakes, landslides, volcanic eruptions, power failures, war, nuclear

22   reaction, or radioactive contamination. (ECF No. 61-2 at 30-31.) In context, the water

23   damage exclusion contemplates not only routine water damage but also unanticipated,

24   drastic events like a once-in-several-decades snowpack melting on the premises. This is

25   further evidenced by the other types of events listed within the exclusion, including floods,

26   tsunamis, and levee breaks. (*Id.* at 30.) Plaintiff's argument that a jury could find the

27   snowmelt was "sudden and accidental" does not therefore create a triable issue of fact

28

1  about coverage because many excluded events are, by their nature, sudden and

2  accidental.

3        Moreover, there is no genuine dispute that Plaintiff's loss was fortuitous. Defendant

4  creates needless confusion on this issue in their Motion and Reply by contrasting "sudden

5  and accidental" events with water damage. (ECF Nos. 61 at 23, 63 at 11.) But Defendant's

6  offhand remarks never seriously contend that damage to the Residence would not be

7  covered even if no exclusion applied. (ECF No. 61 at 23.) Instead, Defendant's argument

8  focuses on the applicability of the water damage exclusion. (*Id.* at 21-22.) The Court

9  agrees that whether there is coverage under the Policy turns on the applicability of an

10  enumerated exclusion, and will now consider whether the water damage exclusion

11  precludes coverage for Plaintiff's loss.

12              **2.**    **The Water Damage Exclusion**

13        The parties do not genuinely dispute that the damage occurred because the

14  ground was oversaturated with water which then intruded into the ground floor of the

15  Residence. Subsection four of the water damage exclusion—which excludes "damage

16  caused by or consisting of . . . [w]ater or water-borne material below the surface of the

17  ground, including water which exerts pressure on or seeps through a building, sidewalk,

18  driveway, foundation, swimming pool, or other structure"—accurately describes the type

19  of water that damaged the Residence. (*Id.*) Plaintiff offers nothing to contradict

20  Defendant's proffered evidence that water damaged the Residence by seeping through

21  the foundation or walls. In fact, both parties' retained consultants attribute the damage to

22  excess water in the ground.[2] (ECF Nos. 61-4 at 2 (Crawford Report), 61-11 at 2 (Midkiff

23  Report), 61-12 at 18 (Lumos Report), 61-14 at 9 (Ninyo Report).) Plaintiff's own testimony

24

25          [2]Some of the consultants attribute the increased saturation of the ground to the

26  nearby golf course and/or otherwise heightened water tables in the region from the
unusual snowpack that season. The parties do not address whether water from an off-

27  site source contributing to the groundwater accumulation surrounding the Residence
would be specifically covered or excluded; however, the Court's reasoning remains

28  unchanged whether the increased groundwater accumulation originates on the premises
of off-site.

regarding his understanding of the water intrusion's cause states "it was rapid snow melt overflowing the saturated ground." (ECF No. 61-1 at 6.) The parties agree that whether caused by melting snow or not, the ground was unable to contain the volume of water without that water intruding into the Residence. The facts are not in dispute and there is no relevant argument that the terms of the Policy are ambiguous.[3] *See Vitale*, 5 P.3d at 1057. Accordingly, the Court will interpret the Policy as a matter of law.

Under the water damage exclusion's plain and ordinary meaning, Plaintiff's loss is excluded. The Policy excludes coverage for water damage that is "caused by" one of the enumerated occurrences and damage that is "consisting of" types of water described in the following subsections. (ECF No. 61-2 at 30.) Plaintiff sometimes attempts to distinguish "snowmelt" from "seepage" as two types of water that are somehow different in kind (ECF No. 62 at 25), while at other times arguing that "determining the origin of the damage is crucial." (ECF No. 62 at 27.) Defendant likewise contemplates a difference between "seepage" and "melting snow" as separate types of water, but ultimately argues that regardless of the water's origin, the Residence suffered water damage from water in the ground. (ECF No. 61 at 22.) As further explained below, the Court finds that any distinction between "snowmelt" and "seepage" is one without a difference for the purposes of the water damage exclusion here.

Whether the intruding water was originally snowmelt or water from another source is of no consequence. The original source of the intruding water does not control whether the water damage exclusion applies. By its terms, the water damage exclusion encompasses losses "arising from, caused by or resulting from human or animal forces, any act of nature or any other source." (*Id.*) Even construing the exclusion narrowly, water damage resulting from a winter that bore a greater than anticipated snowpack certainly falls within an "act of nature" or, at the very least, from "any other source." (*Id.*) The global

---

[3]Plaintiff contends that any ambiguity regarding what qualifies as a "sudden and accidental loss" should be construed in his favor. (ECF No. 62 at 27.) The Court agrees, but as explained above, whether Plaintiff's loss is sudden and accidental is not ultimately determinative of whether the loss is excluded from coverage.

language of the exclusions section also suggests that even if snowmelt was an otherwise covered cause of Plaintiff's loss, the resultant water damage is not covered and thus the loss is excluded. The Policy's language applicable to all exclusions states:

> We do not insure for damage consisting of or caused directly or indirectly by any of the following regardless of:
> (i)     The cause of the excluded event or damage that; or
> (ii)    Other causes of the loss that; or
> (iii)   Whether the event or damage occurs, suddenly or gradually, involves isolated or widespread damage, or occurs as a result of any combination of these to; or
> (iv)    Whether other causes or events act concurrently or in any sequence with the excluded event to
> produce the loss.

(*Id.*) Interpreted plainly, this umbrella clause informs the insured that the Policy excludes coverage for an excluded loss irrespective of its precipitating cause or causes. The original source of the water—whether from melting snow or some other water saturating the ground—does not control the applicability of the groundwater subsection of the water damage exclusion.

But even if the language of the exclusions section and the water damage exclusion were less clear, Nevada law also leads the Court to conclude that Plaintiff's loss is excluded from coverage. The parties agree that water damage—whether the result of snow melting on the surface of the ground, water rising from the ground, runoff water from the nearby golf course, or some other source—caused the damage to the Residence. (ECF Nos. 61 at 22-23, 62 at 4-6.) Had water from outside the Residence not accumulated, either above or below the surface of the ground, because of the snowstorm or from another cause, the Residence would not have sustained water damage. Accordingly, the water damage is efficient proximate cause of the Plaintiff's loss. *See Fourth St. Place*, 270 P.3d at 1244. Even if an otherwise covered antecedent event contributed to the water damage,[4] the loss is excluded because the efficient proximate

---

[4]Contrary to Plaintiff's assertion that snow or melting snow is not included in the enumerated weather exclusions (ECF No. 62 at 27), the Policy further states "[w]e do not insure for loss caused by any of the following . . . . Weather Conditions which includes but is not limited to heat, cold, humidity, rain, ice, snow, sleet, wind, hail or drought" (ECF No. 61-2 at 31). While it is unnecessary to reach whether Plaintiff's loss is "caused by"

1   cause of the loss falls under an enumerated exclusion. *See id.* The Court therefore cannot

2   find that a reasonable interpretation of the Policy would cover otherwise excluded

3   groundwater damage simply because the original source of the water was snowmelt.

4       Because the loss was excluded under the Policy, Defendant did not breach the

5   contract by denying Plaintiff's claim. Accordingly, the Court will grant Defendant's Motion

6   as to the breach of contract claim. As a necessary result, the Court will deny Plaintiff's

7   requested declaratory relief.

8       **B.    Bad Faith and the Implied Covenant of Good Faith and Fair Dealing**

9       The parties dispute whether Plaintiff's bad faith claims are appropriate for

10   resolution at summary judgment. Plaintiff argues that he has produced sufficient evidence

11   for a trier of fact to find that Defendant denied his claim without having a reasonable basis

12   to do so. (ECF No. 62 at 17.) Specifically, Plaintiff argues that Defendant's failure to

13   properly investigate the claim and its disregard of its insured's interest provide a genuine

14   dispute of material fact that can only be determined by the factfinder. (*Id.* at 21, 23.)

15   Defendant counters that summary judgment is appropriate because the Court may

16   determine whether an insurer's actions were reasonable as a matter of law, and that is

17   the only issue in dispute. (ECF No. 61 at 23.) As further explained below, the Court agrees

18   with Defendant and will therefore grant its Motion on the bad faith claims.

19       **1.    Legal Standard**

20       "Although every contract contains an implied covenant of good faith and fair

21   dealing, an action for tort for breach of the covenant arises only in 'rare and exceptional

22   cases' where there is a special relationship between the victim and tortfeasor." *Ins. Co.*

23   *of The West v. Gibson Tile Co., Inc.*, 134 P.3d 698, 702 (Nev. 2006) (quoting *K Mart Corp.*

24   *v. Ponsock*, 732 P.2d 1364, 1370 (Nev. 1987)). Accordingly, liability in tort exists only

25   where such a special relationship exists, as between an insurer and its insured. *See*

26   *Aluevich v. Harrah's*, 660 P.2d 986, 987 (Nev. 1983) (observing there is "a cause of action

27   _____

28   snow under this limitation because the water damage is the efficient proximate cause of
    the loss, the Court notes that even an antecedent contributing cause to Plaintiff's damage
    is not unquestionably covered by the Policy.

in tort for the breach of an implied covenant of good faith and fair dealing where an insurer fails to deal fairly and in good faith with its insured by refusing, without proper cause, to compensate its insured for a loss covered by the policy"). "An insurer breaches the duty of good faith when it refuses 'without proper cause to compensate its insured for a loss covered by the policy.'" *Pioneer Chlor Alkali Co., Inc. v. Nat'l Union Fire Ins. Co.*, 863 F. Supp. 1237, 1242 (D. Nev. 1994) (quoting *United States Fid. & Guar. Co. v. Peterson*, 540 P.2d 1070, 1071 (1975)).

"To establish a prima facie case of bad-faith refusal to pay an insurance claim, the plaintiff must establish that the insurer had no reasonable basis for disputing coverage, and that the insurer knew or recklessly disregarded the fact that there was no reasonable basis for disputing coverage." *Powers v. United Serv. Auto. Ass'n*, 962 P.2d 596, 604 (Nev. 1998). Put another way, "a bad faith claim has both an objective element and a subjective element." *See Flonnes v. Prop. & Cas. Ins. Co. of Hartford*, Case No. 2:12-cv-01065-APG-CWH, 2013 WL 3109381, at *4 (D. Nev. Jun. 17, 2013); *see also Am. Excess Ins. Co. v. MGM Grand Hotels, Inc.*, 729 P.2d 1352, 1354 (Nev. 1986) ("Bad faith involves an actual or implied awareness of the absence of a reasonable basis for denying benefits of the policy."). "Poor judgment or negligence on the part of an insurer does not amount to bad faith." *USF Ins. Co. v. Smith's Food & Drug Ctr., Inc.*, 921 F. Supp. 2d 1082, 1093 (D. Nev. 2013), *as corrected* (Mar. 27, 2013). "[T]he insurer is not liable for bad faith for being incorrect about policy coverage as long as the insurer had a reasonable basis to take the position that it did." *Pioneer Chlor Alkali Co., Inc.*, 863 F. Supp. at 1242. Instead, "[b]ad faith involves something more than an unreasonable action, a negligent action, by the insurer." *Schumacher v. State Farm Fire & Cas. Co.*, 467 F. Supp. 2d 1090, 1095 (D. Nev. 2006) (citing *Pioneer Chlor Alkali Co., Inc.*, 863 F. Supp. at 1243). "Bad faith exists where an insurer denies a claim with knowledge that no reasonable basis exists to deny the claim." *Id.*

"When there is a genuine dispute regarding an insurer's legal obligations, the district court can determine if the insurer's actions were reasonable." *Allstate Ins. Co. v.*

1    *Miller*, 212 P.3d 318, 329 (Nev. 2009). "However, a jury question on insurer's bad faith

2    arises when relevant facts are in dispute or when facts permit differing inferences as to

3    the reasonableness of insurer's conduct." *United Fire Ins. Co. v. McClelland*, 780 P.2d

4    193, 197 (Nev. 1989). "Generally, a bad-faith claim is subject to summary judgment if the

5    defendant demonstrates that there was a genuine dispute as to coverage, because if the

6    insurer had a reasonable basis to deny coverage, the insurer is unlikely to know it was

7    acting unreasonably." *McCall v. State Farm Mut. Auto. Ins. Co.*, Case No. 2:16-cv-01058-

8    JAD-GWF, 2018 WL 3620486, at *3 (D. Nev. Jul. 30, 2018) (internal quotation omitted).

9    "Where the undisputed evidence shows that the insurer had some reasonable basis for

10    acting as it did, there is no bad faith." *Igartua v. Mid-Century Ins. Co.*, 262 F. Supp. 3d

11    1050, 1054 (D. Nev. 2017).

12            **2.  Failure to Investigate**

13         Plaintiff first argues that Defendant failed to adequately investigate before denying

14    his claim. (ECF No. 62 at 19.) Plaintiff supports his argument with six reasons: (1)

15    Defendant only interviewed Plaintiff, not the investigating adjuster or any expert, before

16    denying the claim; (2) the investigating adjuster who visited the property prior to the claim

17    denial was not an expert; (3) the quality of the investigation was insufficient to support a

18    reasonable basis for denial; (4) Defendant violated its own procedures in denying the

19    claim; and (5) Defendant failed to try to discover evidence that the claim could be covered

20    as a "sudden and accidental loss". (*Id.* at 19-21.) Defendant argues that Plaintiff has failed

21    to produce any evidence that its denial was unreasonable or otherwise evinced that

22    Defendant knew or recklessly disregarded that there was no reasonable basis to deny

23    Plaintiff's claim. The Court agrees with Defendant, as explained further below.

24         An insurer's failure to properly investigate an insured's claim can support a claim

25    for bad faith under Nevada Law. *See Powers*, 962 P.2d at 604 (denying summary

26    judgment when there was "abundant evidence" that "[the insurer's] investigation was

27    improper, incomplete, poorly done, [and] in violation of [its] own procedures"). However,

28    evidence that an insurer failed to properly investigate is only probative insofar as it

supports the ultimate conclusion that an insurer denied a claim without a reasonable basis to do so. None of Plaintiff's proffered evidence demonstrates that Defendant denied Plaintiff's claim knowing there was no reasonable basis for the denial.

Only one of Plaintiff's proffered reasons is both supported by evidence and relevant to the Court's determination. As stated above, whether Plaintiff's loss was "sudden and accidental" is not determinative of coverage if an exclusion applies. Moreover, an insurer's choice of whether to conduct interviews or retain experts to support its determination that a loss is excluded may be probative of whether it had a reasonable basis to deny a claim, but is by no means dispositive. Similarly, an insurer's speed in handling a claim could indicate that it had not adequately investigated, but efficiency does not necessarily prove inadequacy. The Court ultimately must consider whether (1) there was an objectively reasonable basis for Defendant's decision and, if not, whether (2) Defendant subjectively knew or recklessly disregarded that no reasonable basis to deny the claim existed. *See Flonnes*, 2013 WL 3109381 at \*4.

Plaintiff offers no evidence that his claim was denied absent any reasonable basis. First, Plaintiff claims Defendant determined there was no coverage for the loss within "the first few seconds" of the initial claim report. (ECF No. 62 at 19.) But this is not supported by the evidence. It is undisputed that Bristow received the initial report of claim from Plaintiff, spoke with him for a few minutes, and entered notes into Defendant's internal system indicating he believed the claim implicated a policy exclusion. (ECF Nos. 61-3 at 3.) But these notes were not a denial; instead, Bristow testified that the notes in his log were just "key points" he wrote down "so that [he] can reference them." (ECF No. 62-7 at 21.) He admits he spoke to Plaintiff for "approximately ten minutes or so, during which time he told Plaintiff that there was likely no coverage because of the seepage exclusion. (*Id.* at 22, 25.) But at that time, the claim remained open pending the field investigation. (ECF No. 61-3 at 3-4.) Defendant denied Plaintiff's claim only after retaining an independent adjuster to gather information from the Residence on which it could base its determination and reviewing that report. (ECF No. 62-12.) The Denial Letter expressly

refers to the investigation, noting that it was conducted by an "Independent Adjuster," and provides the water damage exclusion as the reason for denial. (*Id.* at 2.)

Next, Plaintiff offers no evidence that Defendant violated its own procedures. He asserts that because a typical water damage claim takes an average of 19 to 36 days to investigate but Plaintiff's claim was denied after only four days, Defendant's denial was unreasonable. But this ignores that in those four days, Defendant ordered an investigation of the premises, reviewed the photographs of the damage, and independently determined the observable damage was caused by water intruding into the house from the ground. The claims log reflects that Defendant retained Siebrandt, an independent adjustor from Crawford, to go to the Residence and gather evidence to determine whether Plaintiff's loss was caused by groundwater. (ECF No. 61-3 at 4.) Siebrandt returned his report to Defendant, replete with 20 photographs of the damage, including a pile of snow near the foundation. (ECF No. 62-10 at 10-19.) Bristow testified that when he receives a report from an independent adjuster, he then conducts an independent review based on the photographs to determine whether the loss is covered. (ECF No. 61-5 at 7.)

Finally, Plaintiff's arguments about the quality of the investigation—that Siebrandt was not an expert and that the investigation did not rule out other potential causes for the water damage—do not sufficiently demonstrate that Defendant denied Plaintiff's claim without a reasonable basis. Plaintiff offers Nortech's conclusion that because Siebrandt did not conduct a "subsurface investigation" he could not have concluded the water damage was caused by groundwater. (ECF No. 61-15 at 2.) But there is no legal requirement that an insurer retain an expert to determine the cause of every claim before denying it. Nor must an adjuster rule out every possible alternate cause for a loss. Even if a claim is wrongly denied, an insurer is not necessarily liable for bad faith, provided it had a reasonable basis for its determination. *See Pioneer Chlor Alkali Co., Inc.*, 863 F. Supp. at 1242. Plaintiff ultimately fails to provide evidence that Defendant knew—or recklessly disregarded its obligation to determine—that there was no reasonable basis to deny Plaintiff's claim.

### 3.    Failure to Consider the Insured's Interests

As a second justification for his bad faith claim, Plaintiff argues Defendant acted in bad faith by not considering its interests "equally" with Plaintiff's. (ECF No. 62 at 21.) Defendant argues this duty arises only during settlement negotiations and applies to bad faith claims for refusal to settle, but not to any duty in determining whether to approve or deny a claim. (ECF No. 63 at 14-15.) The Court agrees with Defendant.

Nevada law does not expressly recognize a duty for insurers to consider the insureds' "interests" before denying a claim. Plaintiff cites to *Avila v. Century National Insurance Company*, Case No. 2:09-cv-00682-RCJ-GWF, 2010 WL 11579031, at *4 (D. Nev. Feb. 10, 2010) to support his assertion that an insurer must "equally consider [Plaintiff's] interests as part of the fiduciary relationship." (ECF No. 62 at 23.) But Defendant correctly points out that *Avila* and the Nevada Supreme Court case that it references are both analyzing the insurer's particular duties to its insured regarding the duty to defend, indemnify, or settle. *See id.* (considering summary judgment for a bad faith refusal to settle claim); *Allstate*, 212 P.3d at 325-26 (finding an insurer may be liable for bad faith by failing to adequately inform an insured in settlement). In fact, the Nevada Supreme Court in *Allstate* expressly distinguished its analysis applicable to duty to defend from other claims for insurance bad faith. *Id.* at 325 (previewing its reasoning by stating "a bad faith action applies to more than just an insurer's denial or delay in paying a claim. An insurer's failure to adequately inform an insured of a settlement offer may also constitute grounds for a bad-faith claim." (internal citations omitted)).

This is not to say an insurer owes no duty to its insureds when evaluating a claim. Neither is it the case that a "special relationship" does not exist between an insurer and its insured. *See Ins. Co. of The West v.*, 134 P.3d at 702; *see also Powers*, 962 P.2d at 603 (finding that an insurer acted in bad faith when it concealed information from its insured). This special relationship provides the justification for extending tort liability to insurers for acting in bad faith. *See Ins. Co. of The West*, 134 P.3d at 702. But the standard for assessing whether the implied covenant of good faith and fair dealing has

1    been breached differs depending upon the type of bad-faith claim asserted. When

2    deciding whether to approve or deny a claim, that standard is whether the insurer knew

3    or acted with reckless disregard about whether there was not a reasonable basis for its

4    decision to deny the claim. *See Powers*, 962 P.2d at 604; *Schumacher*, 467 F. Supp. 2d

5    at 1095.

6         As explained above, under the appropriate standard, Plaintiff has failed to provide

7    evidence that Defendant knew there was no reasonable basis to deny Plaintiff's claim.

8    Accordingly, the Court will grant Defendant's Motion as to the claims for breach of the

9    implied covenant of good faith and fair dealing.

10             **C.    Unfair Claims Practices**

11        The parties dispute whether Defendant can even be liable pursuant to Nevada's

12    Unfair Claims Practices Act under the facts presented. Defendant argues Plaintiff has

13    failed to provide sufficient evidence that "an officer, director, or department head of the

14    insurer" knowingly permitted or had prior knowledge of a violation of NRS § 686A.310, a

15    threshold requirement for liability. *See* NRS § 686A.270. In response, Plaintiff attests that

16    Porter, Bristow's manager, meets the statutory requirement. (ECF No. 62 at 24.)

17    Defendant replies that Porter is not a department head, but a claims manager within the

18    claims department, and therefore does not satisfy the statutory requirement. (ECF No. 63

19    at 16.) The Court agrees that Porter does not qualify as a department head and, in the

20    absence of any evidence that another person does qualify who would have possessed

21    the requisite prior knowledge, the Court will grant Defendant's Motion on this claim.

22        The Nevada Unfair Insurance Practices Act prohibits more than a dozen unfair

23    trade practices by insurers and provides plaintiffs with a private right of action for

24    violations of the statute. *See* NRS § 686A.310. But "[t]he unfair practices statute clearly

25    requires proof that an officer, director, or department head was aware of the violations."

26    *Hackler v. State Farm Mut. Auto. Ins. Co.*, 210 F. Supp. 3d 1250, 1255 (D. Nev. 2016)

27    (finding "Claims Teams Managers" did not qualify under the statutory requirements of

28    NRS § 686A.270); *see also Yusko v. Horace Mann Servs. Corp.*, Case No. 2:11-cv-

00278-RLH-GWF, 2012 WL 458471, at *4 (D. Nev. Feb. 10, 2012) (granting summary judgment where plaintiff had not presented any evidence that an officer, director, or department head was aware of the conduct in question). Moreover, "the statute's unambiguous language requires prior knowledge, not after-the-fact ratification." *Skinner v. Geico Cas. Ins. Co.*, Case No. 2:16-cv-00078-APG-NJK, 2018 WL 1075035, at *7 (D. Nev. Feb. 26, 2018).

Claims managers generally do not qualify as department heads, officers, or directors. *See Hackler*, 210 F. Supp. 3d at 1255 ("If the legislature wanted to include managers in the list of officials, they likely would have included the term manager."). Porter testifies that at the time Defendant received Plaintiff's claim, she managed a team of adjusters and assisted them in resolving claims. (ECF No. 62-11 at 8-9.) While Plaintiff was free to offer any evidence that per Defendant's managerial structure, Porter qualified as a department head or otherwise qualified as an officer or director, Plaintiff failed to do so. Nor does Plaintiff argue or proffer any evidence that another individual satisfied the statutory requirements of NRS § 686A.270 and had the requisite knowledge prior to any alleged statutory violation. Plaintiff has therefore failed to meet his burden of establishing any officer, director, or department head had knowledge of any violation of NRS § 686A.310. Accordingly, Defendant's Motion will be granted as to the unfair trade practices claim.

## V.   CONCLUSION

The Court notes that the parties made several arguments and cited to several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion as they do not affect the outcome of the motion before the Court.

///

///

///

///

It is therefore ordered that defendant's motion for summary judgment (ECF No. 61) is granted.

The Clerk of Court is directed to enter judgment accordingly and close this case.

DATED THIS 16th Day of March 2021.

MIRANDA M. DU
CHIEF UNITED STATES DISTRICT JUDGE

21